# UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

No. 95-20740

JESSE CAMPOS; W. R. (RESENDEZ)
MORRIS; MEXICAN AMERICAN BAR
ASSOCIATION OF HOUSTON,

                                        Plaintiffs-Appellants,

versus

CITY OF HOUSTON, ET AL.,

                                        Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Texas

May 19, 1997

Before POLITZ, Chief Judge, SMITH and DUHÉ, Circuit Judges.

POLITZ, Chief Judge:

Jesse Campos, W.R. (Resendez) Morris, and the Mexican American Bar Association

of Houston appeal the grant of summary judgment in favor of the City of Houston, et al., in

this voting rights case. For the reasons assigned, we affirm.

**BACKGROUND**

Houston redrew its single-member districts for city council elections based on 1990 census data which disclosed that Hispanics made up 27.6 percent of the total population and 24.1 percent of the voting-age population. The redistricting plan included a mayor and fourteen council members elected from nine single-member districts with five elected at large. Houston voters approved the plan in August 1991.[1]

Since 1991 Houston consistently has elected Hispanic candidates from its two majority Hispanic voting-age population districts. In 1993 an Hispanic incumbent was reelected at large. In 1995 two Hispanic candidates were elected at large. Nevertheless, plaintiffs contend that eliminating the at-large seats and creating additional single-member districts would permit the Hispanic community to elect more city council members. Their evidence indicates that four districts could be drawn in which voting-age Hispanics would be numerous enough to influence the election results.

The district court concluded that the plaintiffs failed to establish a genuine issue of material fact on the threshold requirements of a vote dilution claim and granted summary judgment in favor of Houston. The plaintiffs timely appealed.

---

[1]The Attorney General objected to the plan, stating that it violated section 5 of the Voting Rights Act. 42 U.S.C. § 1973c (1994). The district court ordered the election to proceed. A panel of this court vacated that order because the city failed to obtain preclearance from the Department of Justice; however, the election results were not set aside. **Campos v. City of Houston**, 968 F.2d 446 (5th Cir. 1992), *cert. denied,* 506 U.S. 1050 (1993). The section 5 challenge is not a part of the instant appeal.

# ANALYSIS

## I. Standard of Review

We review the district court's grant of summary judgment *de novo*,[2] construing all evidence in the light most favorable to the nonmoving party. Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[3]

## II. Establishing a Vote Dilution Claim

In 1982 Congress amended section 2 of the Voting Rights Act of 1965 to provide:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .

(b) A violation of subsection (a) . . . is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.[4]

In **Thornburg v. Gingles**, the Supreme Court applied section 2 to an at-large electoral scheme and decided that Congress had intended to eliminate the requirement of showing discriminatory intent in challenges to electoral mechanisms.[5] The amendment re-established

---

[2] **Armstrong v. City of Dallas**, 997 F.2d 62 (5th Cir. 1993).

[3] Fed. R. Civ. P. 56(c).

[4] 42 U.S.C. § 1973 (1994).

[5] 478 U.S. 30 (1986).

3

the "results test,"[6] which focuses on whether the challenged electoral practice prevents the plaintiffs from having an equal opportunity to participate in the political process and to elect candidates of their choice. According to the Court:

> The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives. This Court has long recognized that multimember districts and at-large voting schemes may "'operate to minimize or cancel out the voting strength of racial [minorities in] the voting population.'" The theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters.[7]

The Court noted that several factors could be probative of a section 2 violation. These factors were derived in part from our en banc decision in **Zimmer v. McKeithen:**[8]

> (1.) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

> (2.) the extent to which voting in the elections of the state or political subdivision is racially polarized;

> (3.) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

> (4.) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

> (5.) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education,

---

[6]*See* **White v. Regester**, 412 U.S. 755 (1973).

[7]**Gingles**, at 47 (*quoting* **Burns v. Richardson**, 384 U.S. 73, 88 (1966) (*quoting* **Fortson v. Dorsey**, 379 U.S. 433, 439 (1965))).

[8]485 F.2d 1297 (5th Cir. 1973) (en banc), *aff'd sub nom.* **East Carroll Parish Sch. Bd. v. Marshall**, 424 U.S. 636 (1976) (per curiam). *See* S. REP. NO. 417, 97th Cong., 2d Sess. 28-29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206-07.

employment and health, which hinder their ability to participate effectively in the political process;

(6.) whether political campaigns have been characterized by overt or subtle racial appeals;

(7.) the extent to which members of the minority group have been elected to public office in the jurisdiction.[9]

Two other factors may establish a violation: "'whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group' [and] 'whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.'"[10] Most importantly, the Court articulated three preconditions to establishing a vote dilution claim:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. . . . Second, the minority group must be able to show that it is politically cohesive. . . . Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it--in the absence of special circumstances, such as the minority candidate running unopposed, . . . usually to defeat the minority's preferred candidate.[11]

Failure to establish any one of these threshold requirements is fatal.[12] In the instant case, the district court found that plaintiffs failed to create a genuine issue of material fact on the first and third **Gingles** factors.

A.    **Is the minority group sufficiently large and geographically compact to constitute a majority in a single-member district?**

---

[9]**Gingles**, 478 U.S. at 36-37.

[10]*Id.* at 37.

[11]*Id.* at 50-51 (citations omitted).

[12]**Overton v. City of Austin**, 871 F.2d 529, 538 (5th Cir. 1989).

5

The district court concluded that plaintiffs could not increase the number of Hispanic council members by redistricting. At time of trial three Hispanics served on the city council -- two were elected from single-member districts and one was elected at large. When this appeal was orally argued, there were four Hispanic council members--two elected from single-member districts and two elected at large.

This appeal requires us to confront directly the relevance of citizenship to a vote dilution claim. The Supreme Court thus far has declined to address this issue.[13] Houston's 1990 census evidence shows that 45.8 percent of voting-age Hispanic Houston residents were noncitizens and ineligible to vote. By comparison, 2.2 percent of the non-Hispanic Anglo voting-age population and 1.6 percent of the non-Hispanic Black voting-age population were noncitizens. In communities in which different racial and ethnic groups have approximately equal percentages of noncitizens this data would be insignificant. In Houston, however, the variation is quite marked.

According to the defendants, only 15.3 percent of the total citizen voting-age population is Hispanic. Houston maintains that Hispanics are presently over-represented on the city council because they hold four of fourteen seats, or 28.5 percent. The defendants' expert witness concluded that redistricting could not boost the Hispanic community's representation on the city council. Plaintiffs contend that their evidence contradicts Houston's predictions about redistricting. Their expert opined that "[w]hile I believe that the City projections are in the general ball park, my reading of the information is different from that of the City's expert. Thus, I am unable to confirm the accuracy of the projections which the City makes from these data." He explained that citizenship data is not reliable because

---

[13]**Johnson v. DeGrandy**, 512 U.S. 997 (1994) (assuming without deciding that the first Gingles condition was satisfied).

6

high illiteracy rates and the prevalence of Spanish as a primary language prevent many Hispanics from answering census questions accurately. Additionally, rapid growth and the relative youth of Houston's Hispanic community complicate determining the exact number of Hispanic citizens.

### B.    Use of citizenship data in the *Gingles* analysis.

Plaintiffs urge us to reverse the district court and abandon the examination of citizenship data as a factor for a vote dilution claim. They contend that unlike general census data, which the Supreme Court has determined to be not inherently unreliable despite its significant shortcomings,[14] citizenship data is derived from a 12 percent sampling of the population as opposed to a 100 percent head count. Moreover, citizenship information is unavailable until several years after the release of general census data, which could hinder redistricting.

Despite these limitations, we decline to reject citizenship as a relevant factor in the **Gingles** analysis. The plain language of section 2 of the Voting Rights Act makes clear that its protections apply to United States citizens.[15] As we observed in **Brewer v. Ham**:[16]

> The *raison d'etre* of *Thornburg* and of amended § 2 is to facilitate participation by minorities in our political processes, by preventing dilution of their votes. Only voting age persons can vote. It would be a Pyrrhic victory for a court to create a single-member district in which a minority population dominant in absolute, but not in voting age numbers, continued to be defeated at the polls.[17]

---

[14]**Gaffney v. Cummings**, 412 U.S. 735 (1973).

[15]"No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any *citizen* of the United States to vote on account of race or color . . . ." 42 U.S.C. § 1973(a) (emphasis added).

[16]876 F.2d 448 (5th Cir. 1989).

[17]*Id.* at 452 (*quoting* **Overton**, 871 F.2d at 542 (Jones, J., concurring)).

Similarly, only voting-age persons who are United States citizens can vote. Based on the available data, almost half of Houston's Hispanic voting-age population is ineligible to vote. As the Supreme Court explained in **Gingles**: "Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that practice."[18] Houston's current electoral scheme has enabled its Hispanic community to elect city council members in greater than proportional numbers, based on its citizen voting-age population.

For these reasons, we conclude that plaintiffs have failed to establish a genuine issue of material fact on the first part of the **Gingles** analysis. Because all three conditions must be met to establish a vote dilution claim, it is unnecessary for us to evaluate the second and third elements of the test.

## CONCLUSION

We hold that courts evaluating vote dilution claims under section 2 of the Voting Rights Act must consider the citizen voting-age population of the group challenging the electoral practice when determining whether the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district.

The judgment of the district court is AFFIRMED.

---

[18]**Gingles**, 478 U.S. at 50 n.17.

8